## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy No. 11-25202-JAD |
| | : | |
| FIVE RIVERS PETROLEUM, LLC, | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| ————————————————X | : | |
| | : | |
| COMMUNITY BANK, | : | Doc. ## 143, 151, 152 |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| FIVE RIVERS PETROLEUM, LLC, | : | |
| | : | |
| Respondent. | : | |
| ————————————————X | | |

### MEMORANDUM OPINION

The matters before the Court are the *Chapter 11 Small Business Plan Dated September 11, 2012* (the "Plan") filed by the debtor, Five Rivers Petroleum, LLC (the "Debtor"), and an *Objection to Confirmation of the Plan* and a *Motion to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104*, both filed by Community Bank.  These matters are core proceedings over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(L).  For the reasons set forth more fully below, this Court sustains Community Bank's objection to the Plan, denies the confirmation of the Plan, and denies Community Bank's motion to appoint a trustee.  Additionally, this Court orders the Debtor to show cause as to why this case should not be converted to a chapter 7 proceeding.

**I.**

The Debtor is a limited liability company operating a truck stop in Claysville, Pennsylvania.   The Debtor is indebted to Community Bank in connection with three loans made pursuant to promissory notes and security agreements executed therewith, specifically a loan in the amount of $380,072 made on December 30, 2005, a loan in the amount of $100,000 made on March 6, 2008, and a loan in the amount of $212,800 made on March 23, 2009.  (See Doc. # 30, p. 2).  Pursuant to the security agreements, Community Bank's security interest covers all of the Debtor's personal property, including accounts, inventory, and proceeds thereof.  (See Doc. # 175, p. 1).  Community Bank asserts that the Debtor is further indebted in connection to a commercial guaranty dated December 30, 2005, pursuant to which the Debtor guaranteed the payment of, and performance by, its landlord, S&V Property, LP ("S&V") with respect to a loan in the original amount of $2,204,928.  (See Doc. # 30, pp. 2-3).   The Bank also asserts further indebtedness pursuant to a modification and mortgage extension agreement dated March 9, 2011 and a forbearance agreement dated August 2011.  (See id. at p. 3).[1]

---

[1] Community Bank is the primary secured creditor of both the Debtor and S&V. S&V's bankruptcy case is pending at case number 12-20121-JAD, and S&V's proposed plan of reorganization filed therein at Doc. # 37 is primarily funded by the Debtor's rental payments. According to Community Bank, the Debtor's and S&V's loan payments to Community Bank are inconsistently funded from various sources, including the Debtor, S&V, and the Debtor's various tenants at the truck stop.  (See Doc. # 190, p. 6).

The Debtor filed its voluntary chapter 11 bankruptcy petition on August 18, 2011. (See Doc. # 1). The Debtor filed its first chapter 11 small business plan and disclosure statement on May 22, 2012. (See Doc. ## 95, 97). Community Bank filed an objection to the disclosure statement on June 26, 2012, arguing therein that the disclosure statement "describes a [p]lan that is unconfirmable on its face." (See Doc. # 111, p. 3). Specifically, Community Bank averred in its objection that the disclosure statement "does not project that the Debtor will have sufficient liquidity at exit to pay the arrearages on the S&V Loan required to reinstate the same," and that "the Debtors' projection of future cash flow is not supported by the filed operating reports and therefore cannot be relied upon to support the feasibility of the Debtor's plan." (See id.) The Court granted Community Bank's objection to the disclosure statement by order dated August 15, 2012 at the Debtor's request to file amended financial reports and projections. (See Doc. # 129). On September 11, 2012, the Debtor filed its amended Plan and amended disclosure statement. (See Doc. ## 143, 145).

Eighty-five percent of the total pool of unsecured creditors voted on the amended Plan, the majority of whom voted in favor of the Plan. (See Doc. ## 191, 157). All administrative creditors voted in favor of the Plan. (See Doc. # 191, p. 2). The Debtor asserts that under the Plan, the administrative creditors, priority creditors, and franchise creditors will all be paid in full, while the general, unsecured creditors will receive at least approximately forty-three

percent of their claim, reflecting a pro-rata distribution of $450,000 over the life of the Plan.  (See Doc. # 194, p. 5).

As set forth under the Plan, Community Bank is the primary secured creditor of the Debtor.  The Debtor asserts that Community Bank's claim will be paid in full at the contract rate of interest at the time of the Plan filing within the time frames of Community Bank's original loan term, and Community Bank will retain all of its state court remedies.   (See id.) Community Bank asserts that, because the Debtor argues that Community Bank is not entitled to the legal fees it has accrued since April 2012 (See Doc. # 194, p. 7), Community Bank will not be paid in full under the Plan (See Doc. # 191, p. 3).[2]  Although the Debtor is currently in default on its payments to Community Bank, the Debtor has paid the full principle and interest on all three of its loans to Community Bank.  (See Doc. # 191, p. 6).

On October 9, 2012, Community Bank filed its *Objection to Plan Confirmation* and its *Motion to Appoint a Trustee*.  (See Doc. ## 151, 152).  An evidentiary hearing was held on December 3, 2012, and the parties filed post-trial briefs on January 14, 2013, and replies on January 24, 2013.  The matter is ripe for decision.

## II.

In its *Objection to Plan Confirmation*, Community Bank repeats its arguments presented in its objection to the Debtor's initial disclosure

---

[2] The Court does not address herein the issue of attorneys' fees, as the scope of this *Memorandum Opinion* is limited to the feasibility of the Debtor's Plan.

statement, specifically averring that the Debtor's amended Plan fails to meet the feasibility requirements set forth under Section 1129(a)(11) because the Debtor will lack sufficient cash to exit bankruptcy at consummation of the Plan and because the Debtor's future cash flow projections are not supported by the Debtor's own operating reports.   (See Doc. # 151, pp. 3-4).   11 U.S.C. § 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."   11 U.S.C. § 1129(a)(11).   This feasibility requirement does not mean the plan's success must be guaranteed; only that it provides a realistic and workable framework.   In re Am. Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012).   In other words, the plan must be reasonably likely to succeed on its own terms without a need for further reorganization of the debtor.   Id.

In evaluating the feasibility of a proposed plan under 11 U.S.C. § 1129(a)(11), courts must consider several factors, including the debtor's capital structure, earning power, management capabilities, management continuity, economic conditions, and any matters related to likelihood of success under a plan of reorganization.   In re Rack Eng'g Co., 200 B.R. 302, 305 (Bankr. W.D. Pa. 1996), citing 5 COLLIER ON BANKRUPTCY ¶1129-64.   The Court, noting that it has "broad discretion in resolving the issue of feasibility," In re Rack Eng'g Co., 200 B.R. at 305, determines that the following analysis of these factors reveals

that the Debtor's Plan is not feasible, and thus finds that the Plan cannot be confirmed.

### *Capital Structure and Continuing Insolvency*

A review of the record reveals serious issues with the Debtor's capital structure and continuing viability.

First, Community Bank argues that the Debtor's ongoing financial performance reflects continuous insolvency thereby undermining the feasibility of the Debtor's Plan.  Second, Community Bank avers that the Plan does not contemplate any infusions of capital, either through new debt or equity, "which would leave the Debtors with essentially no capital reserves or liquidity whatsoever to meet even the slightest of operational losses or any type of capital expenditures."  (See Doc. # 190, p. 12).  This Court agrees.

The Debtor's operating reports and habitually overdrawn bank accounts since the filing of this bankruptcy case do not instill this Court's confidence in the Debtor's ability to reorganize.  For example, the Debtor's operating report for September 2012 shows $1.55 million in negative equity, $397,000 in notes payable to shareholders, and only $14,061 in cash on hand.  (See Community Bank's Exhibit 13; See also Community Bank's Exhibit 22 (showing decrease in average monthly account balances)).  Further, the Court finds credible Mr. William Westberg's testimony at trial that the Debtor's revised operating statements, which indicate a $285,000 net operating income for the twelve month period ending July 2012, "[do] not represent an accurate picture of the Debtor's financial performance due to the fact that the enterprise did not

satisfy its obligations to pay its rent and debt obligations" during that time period.  (See Doc. # 151, Exhibit A, p. 2).

Additionally, the Debtor's bank account was overdrawn thirty-seven times in 2011, and thirty-nine times in the first eleven months of 2012.  (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (4:08-4:11 PM)).  Specifically, on December 24, 2012, the Debtor's demand deposit account number 8001423769 was overdrawn in the amount of $81,948.63, and on December 26, 2012 the same account was overdrawn by $62,263.50. (See Doc. # 190, Exhibit A, Affidavit of Sherri L. Vlainich, Collection Supervisor for Community Bank, p. 1).  The demand deposit account continues to be overdrawn consistently, again on December 31, 2012, January 4, 2013, January 7, 2013, and January 8, 2013.  (See id. at p. 2).

Although the Debtor's principals asserted at the hearing on December 3, 2012 that "there were no checks issued by the Debtor that bounced" (See Doc. # 194, p. 3), the Debtor overdrew its accounts "at least an additional six times and bounced at least two checks" since the hearing held on December 3, 2012 (See Doc. # 190, p. 6).  Specifically, check number 17027 in the amount of $28,555.56 and check number 7347 in the amount of $640.72 were both returned for insufficient funds.  (See Doc. # 190, Exhibit 1, pp. 1-2).

The Debtor's lack of capital structure is also apparent in its need to transfer money between the Debtor's and S&V's accounts on a daily basis to cover overdrafts, and its occasional deposits of large sums of cash.  (See Doc. # 190, Exhibit 1, p. 2 ("On January 11, 2013, [the Debtor] took $13,000 out of …

[S&V's] account ..., which represented substantially all of the funds in the S&V account."); Doc. # 193, Exhibit 1, p. 1 ("On January 17, 2012, [the Debtor] made a deposit ... in the amount of $10,000, all of which was cash consisting of all $100 bills.  The deposit of a large amount of cash is not typical for [the Debtor] and casts doubts as to whether the cash was generated by [the Debtor's] operations."); Doc. # 190, Exhibit 1, p. 2 ("On December 27, 2012, a deposit ... was processed in the amount of $18,476.53, of which $15,930.09 was in cash.")).

Additionally, when the principals of the Debtor were asked at the hearing about the existence of any capital reserve fund, they were unable to testify with certainty whether the Debtor established any such reserve fund, but asserted that capital improvements of approximately $3,000 a month "have been built into [the Debtor's] projections" for operating expenses such as repaving or otherwise improving the deteriorating parking lot.  (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (11:21-11:22 AM)).   The Debtor's subsequent filings have represented that its Plan include $5,000 per month for capital improvements.  (See Doc. # 191, p. 5).  As Community Bank points out in its *Reply to the Debtor's Post-Trial Brief*, $5,000 represents only 0.003% of the Debtor's $19 million in annual revenue.  (See Doc. # 193, p. 4). The Court appreciates Community Bank's concern over this small amount of funds reserved for capital improvements and finds this amount to be insufficient, especially in light of the Debtor's financial performance to date.

The Court is also concerned by the Debtor's inability to maintain an environmental escrow account to remedy pre-existing environmental concerns at the truck stop. According to Community Bank, "when the loan was made, a requirement of the loan was that an environmental escrow account be set up, and that the [Debtor] pay $2,000 a month into in to build up a reserve fund for … environmental clean-up." (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (3:46 PM)). However, "at some point, because of the borrower's financial straits, [Community Bank] suspended the $2,000 [escrow deposit requirement], and then at a later point because of [the Debtor's] financial problems, [Community Bank] permitted them to invade that environmental fund." (See id.) The Court notes that Community Bank acquiesced to the Debtor's use of these escrow funds for payment of operating expenses, but nonetheless considers the Debtor's inability to maintain such an account indicative of a lack of meaningful capital structure, especially in light of the apparent lack of a capital reserve fund, and the fact that the Debtor still has not remedied the environmental issues. This Court agrees.

For these reasons, the Court finds that the Debtor's capital structure strongly suggests that the Debtor's Plan is not feasible.

### *Earning Power*

The Court agrees with Community Bank that the Debtor's significant economic losses, particularly when viewed in light of its consistent increases in operating expenses, are also indicative of the Plan's infeasibility. In support of this argument, Community Bank points to the Debtor's failure to generate

sufficient income to meet expenses for the past several years, its economic losses of $1.4 million in the four years prior to the bankruptcy, and the fact that the Debtor's cash reserves have fallen throughout the pendency of this bankruptcy case, despite being "relieved of payments to prepetition creditors and several months of back payments." (See Doc. # 190, p. 13; Community Bank Exhibit 22; Doc. # 190, Exhibit A). This Court also finds persuasive the Debtor's reported losses reflected on their tax returns. Specifically, in 2010, the Debtor suffered $464,000 in ordinary business losses, and $333,000 of losses in 2011, resulting in the principals' taking money out of retirement savings to cover required payments. (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (2:35 PM)).

While the Debtor disputes unprofitability, and argues that the "trend in sales numbers are … going upward" (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (3:13 PM)), the Court notes that the Debtor's operating reports also show a consistent increase in operating expenses (See Audio Recording of Hearing Held in Courtroom D, December 3, 2012 (3:10-3:11 PM)). In addition, the Debtor's bank accounts appear to be in a constant state of overdraft. This Court finds that the Debtor's continued increase in expenses, combined with the Debtor's deficient capital structure, further demonstrates the Debtor's inability to successfully reorganize, and thus the infeasibility of the Plan.

### *Management Capabilities and Continuity[3]*

Community Bank avers that because the Debtor proposes no management changes in their reorganization Plan, "it seems extremely overly optimistic to expect this management team to be able to turn things around and operate the Debtors as a viable enterprise," and as such, the Debtor's Plan is "simply not feasible with the current management structure in place."  (See Doc. # 190, p. 14; In re Gulph Woods Corp., 84 B.R. 961, 974 (Bankr. E.D. Pa. 1988) ("In sum, we have before us the archetypical case where the probability of continuation of management combined with the proven inability to manage in the past dooms a plan to almost certain defeat on the basis of its lack of feasibility.")).  This Court agrees with Community Bank.

The Debtor asserts that "there is now a very clear 'chain of command' and each of the Debtor's principals knows their roles in operations and management of the business and … they are up to date on the status of the various aspects of the business."  (See Doc. # 191, p. 7).  However, Community Bank has persuaded this Court that the Debtor's principals are not up to date on the status of various managerial and operational issues, such as the Debtor's failure to repair a malfunctioning fuel pump (resulting in losses of approximately $300,000 to $400,000), and the continued existence of

---

[3] Although In re Rack Engineering sets forth management capabilities and management continuity as two separate factors, the Court will analyze them together since the Debtor's Plan proposes no change in management.  The Court therefore considers the factor of management continuity in conjunction with management capabilities, both past and present.

environmental concerns, two issues repeatedly raised throughout the pendency of this bankruptcy. (See Doc. # 190, p. 2). The Debtor's lack of knowledge, oversight, and supervision over these issues suggests management may not be able to reorganize the debtor. While it may be true that the Debtor was unable to timely discover the malfunctioning fuel pump or determine whether the Debtor complied with the environmental reporting required by the Pennsylvania Department of Environmental Protection, the fact that the Debtor's principals have not been able to sufficiently explain or address these issues to the satisfaction of this Court, despite ample opportunity to do so, leaves this Court with serious concerns of management's capabilities.

Community Bank raises additional concerns regarding management's accounting controls, such as the Debtor's failure to pay real estate taxes in 2008 (See Doc. # 190, p. 5), the Debtor's failure to timely provide financial reports required under loan documents (See id. at 6), the deficiency and incomprehensibleness of such reports (See id.), and the fact that the funding of the Debtor's payments to Community Bank on the various loans have come from different accounts of the Debtors on an inconsistent basis (See id.). This Court agrees with Community Bank that these issues indicate a lack of proper accounting controls, and raise valid concerns regarding management capabilities.

### *Economic Conditions*

Community Bank asserts that "[t]here is no evidence that economic conditions have changed significantly to indicate that the Debtors' operations

will suddenly improve.  If anything, the fracking and related activity in the vicinity of the Debtors' truck stop has likely decreased over the last few years and will result in a downturn in the Debtors' business." (See Doc. # 190, pp. 13-14).   While this Court appreciates the Debtor's argument that the rebranding of the business away from one as a non-descript gas provider and toward a recognizable image as a truck stop provider for veterans could improve its economic conditions, no evidence of such has been provided to the Court.   Moreover, the Debtor, in an attempt to explain its substantial losses reflected on its tax returns, blamed "the overall economy and rapid increases in fuel costs and similar factors." (See Doc. # 194, p. 2).  Without evidence that these economic conditions will improve, this Court finds that this factor also suggests the Plan's infeasibility, especially when viewed in light of the Debtor's increasing expense, continual overdrawing of accounts, and lack of capital reserves.

### *Other Matters*

Lastly, this Court looks to other matters which may speak to the Plan's feasibility, including the duration of the payout.  The Court notes that although the Debtor asserts that the thirteen-year payoff term included in the Plan mirrors the payoff terms of the original loan, "[i]t is an axiom of common sense that 'proof of feasibility is an easier task when payouts [to creditors] are done over shorter periods of time [because, t]he longer the debtor proposes a payout, the more difficult it may become to prove distant ability to service debts.' In re Rack Eng'g Co., 200 B.R. at 307, citing 5 COLLIER ON BANKRUPTCY

¶1129.02[11][a] at 1129–64.  Because the payout duration term mirrors the original duration term, this factor alone would certainly not warrant the denial of the Plan.  However, the Court does acknowledge that, in light of the Debtor's increasing expenses, and inability to instill this Court's confidence in its capital structure, earning power, and economic conditions, a thirteen year payout term may not be feasible in this instance.

Thus, after a review of those factors set forth in In re Rack Engineering Company, this Court finds the Debtor's Plan is not feasible, and confirmation is therefore denied.[4]

## III.

Community Bank also requests that this Court appoint a chapter 11 trustee under 11 U.S.C. § 1104(a) to oversee the management of the Debtor throughout the pendency of its bankruptcy action.  Community Bank asserts that this Court should appoint a trustee, both because the managerial issues

---

[4] Community Bank also asserts that the Plan should not be approved under the cramdown provision of the Bankruptcy Code, codified at 11 U.S.C. § 1129(b)(2)(A), because the Plan is neither fair nor equitable with respect to Community Bank.  Specifically, Community Bank contends that the proposed Plan does not provide deferred cash payments totaling at least the allowed amount of Community Bank's claims which is asserted by Community Bank to be $2,836,120.59 as of December 31, 2012.  (See Doc. # 190, Exhibit B).  The Court need not decide the merits of this objection as the Court denies confirmation of the Plan because the proposed plan is not feasible.  The Court would note, however, that (a) Community Bank filed no proof of claim(s) in this bankruptcy case, (b) the schedules filed by the Debtor at Schedule D listed Community Bank's claim in the amount of $647,537.00, and (c) the Plan proposed to pay Community Bank the aggregate amount of $2,868,372.00 in deferred cash payments over 164 months with interest at the rate of 5.75%. (See Doc. # 143).

enumerated above constitute gross mismanagement under section 1104(a)(1),
and because an appointment would be in the best interest of the creditors
under section 1104(a)(2).  This Court finds that the appointment of a trustee is
not warranted under either subsection, as Community Bank has not met its
burden in proving the necessity of appointing a trustee by clear and convincing
evidence.

Pursuant to section 1104(a), bankruptcy courts can order the
appointment of a trustee at any time after the commencement of the case but
before confirmation of a plan, either:

> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of the case,
> or similar cause, but not including the number of holders of
> securities of the debtor or the amount of assets or liabilities of the
> debtor; or
> (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard
> to the number of holders of securities of the debtor or the amount
> of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

"The party moving for appointment of a trustee ... must prove the need
for a trustee under either subsection by clear and convincing evidence."
Official Comm. of Asbestos Claimants v. G–I Holdings, Inc. (In re G–I Holdings,
Inc.), 385 F.3d 313, 317 (3d Cir. 2004), citing In re Marvel Entertainment
Group, Inc., 140 F.3d 463, 473 (3d Cir. 1998).  See also In re Sharon Steel
Corp., 871 F.2d 1217, 1226 (3d Cir.1989).  If a court finds that the moving
party has discharged this burden, it "shall" appoint a trustee, 11 U.S.C. §
1104(a), but determining whether the moving party has satisfied its burden

under either subsection is committed to the court's discretion. In re G–I Holdings, Inc., 385 F.3d at 317, citing In re Marvel Entertainment Group, Inc., 140 F.3d at 471.

Comparing the instant case to those where the gross mismanagement of a debtor did substantiate trustee appointment under section 1104(a)(1), this Court finds that the Debtor's actions here do not rise to such a level. For example, in In re Sharon Steel Corp., the bankruptcy court found that the appointment of a trustee was mandatory in light of the debtor's insider transfers of assets of significant value, which the court found would constitute either voidable preferences or fraudulent conveyances. In re Sharon Steel Corp., 86 B.R. 455, 459 (Bankr. W.D. Pa. 1988) subsequently aff'd, 871 F.2d 1217 (3d Cir. 1989). Additionally, in In re Shubh Hotels Pittsburgh, LLC, this Court held that the record contained clear and convincing evidence that a trustee should be appointed, due to animosity and acrimony between the parties, anticipation of extensive litigation costs, and prepetition diversion of revenues for individuals' personal benefit. Carbon Capital II Real Estate CDO 2005-1 Ltd., v. Shubh Hotels Pittsburgh, LLC (In re Shubh Hotels Pittsburgh, LLC), No. BR 10-26337 JAD, 2011 WL 7145601 (Bankr. W.D. Pa. Feb. 1, 2011). See also In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3d Cir.1998) (appointment of trustee appropriate given high level of acrimony in complicated case). Here, the record does not establish that the Debtor's management issues rise to the level of gross mismanagement for purposes of 11 U.S.C. § 1104(a)(1). The Court is simply not confident that existing

management can reorganize the Debtor in light of the Debtor's broken capital structure and operating history to date.

Community Bank has also not met its burden under section 1104(a)(2). Section 1104(a)(2) "provides a flexible standard for the appointment of a trustee," under which "the Court may utilize its broad equity powers to engage in a cost benefit analysis in order to determine whether the appointment of a [t]rustee would be in the interests of the creditors, equity security holders, and other interests of the estate." In re Sharon Steel Corp., 86 B.R. at 457. "Consequently, the analysis becomes one of whether the cost of appointing a [t]rustee is outweighed by the benefits derived by the appointment." Id. In conducting such an analysis, this Court notes that "[t]he appointment of a [t]rustee in a [c]hapter 11 case is an extraordinary remedy which should not be granted lightly, as it may impose a substantial financial burden on a hard-pressed debtor seeking relief under the Bankruptcy Code." Id., citing In re Hotel Associates, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

Here, the Debtor is hard-pressed, as evidenced by its operating statements, overdrawn checking account, and increasing expenses. This Court believes that, at this point in the Debtor's chapter 11 proceeding, the appointment of a trustee would likely impose a substantial financial burden while this case remains in Chapter 11, and would thus not be in the best interest of the creditors under section 1104(a)(2).

Because this Court does not find that Community Bank has clearly and convincingly proven that the Debtor's management constitutes cause to

appoint a trustee or that the appointment of a trustee would be in the creditors' best interest, this Court cannot grant Community Bank's *Motion to Appoint a Chapter 11 Trustee.*  However, in light of the evidence presented at the hearing and analyzed above, this Court has serious doubts as to the Debtor's ability to reorganize, and finds that conversion to a chapter 7 proceeding may be warranted.  See, e.g., Andrew C. Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.), 374 B.R. 556 (Bankr. M.D. Pa. 2007).  This Court will therefore issue herewith a *Rule to Show Cause* that this bankruptcy case should not be converted to a chapter 7 proceeding.

## IV.

In conclusion, this Court finds that the Debtor's Plan is not feasible under 11 U.S.C. § 1129(a)(1) or § 1129(b)(2).  Community Bank's objection to the Plan is therefore sustained, and confirmation of the Plan is denied. Further, Community Bank has not met its burden of proving that the appointment of a chapter 11 trustee is warranted in this case, under the clear and convincing standard of proof.  However, the Court remains concerned about the Debtor's ability to reorganize in light of its significant financial, administrative, and managerial issues.  As such, this Court orders herewith a *Rule to Show Cause* as to why this bankruptcy case should not be converted to a chapter 7 liquidation.  An appropriate order will be entered.


**Date**: February 22, 2013          /s/ Jeffery A. Deller
                                     **JEFFERY A. DELLER**
                                     United States Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
Michael J. Henny, Esq.
Brian P. Fagan, Esq.
Christopher M. Frye, Esq.
Office of the U.S. Trustee